# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| THOMAS MCNEAL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 18 CV 5064 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| PRESENCE CHICAGO HOSPITALS ) | |
| NETWORK, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Thomas McNeal, brought this employment-discrimination action against his former employer, Presence Chicago Hospitals Network ("Presence"). McNeal alleges that Presence terminated his employment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. For the reasons set forth below, defendant's motion for summary judgment is granted.

## LOCAL RULE 56.1 STATEMENTS

Plaintiff admits the majority of defendant's statements of material fact. Many of plaintiff's denials of defendant's properly-supported statements of material fact are not responsive to their substance, and/or the denial is not supported by the evidence cited. (ECF No. 50, Pl.'s Resp. Def.'s L.R. 56.1 Stmt. ¶¶ 11, 23, 41, 42, 43, 44, 45, 58, 61, 62, 64, 66, 67.) Accordingly, the Court deems plaintiff to have admitted those facts. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) (when a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the local rule, those facts are deemed admitted for purposes of the motion); *Dapkus v. Chipotle Mexican Grill, Inc.*, No. 15 CV 6395, 2017 WL 36448,

at *1 n.1 (N.D. Ill. Jan. 4, 2017) ("The requirements for responses are not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted.") (internal quotation marks and citation omitted).

As for plaintiff's statement of additional material facts, plaintiff has in several instances improperly distorted or exaggerated testimonial evidence. (*E.g.*, ECF No. 49, Pl.'s L.R. 56.1 Stmt. Add'l Facts ¶ 3 (stating that Margaret Graham "recommended McNeal's termination" when the witness's testimony was that the recommendation was made *to* Graham and she agreed); ¶ 4 (stating that plaintiff "sincerely apologized" when neither witness in the cited testimony used that phrase); ¶ 13 (stating that Graham was aware that plaintiff "had complaints about pain in his legs that affected his mobility" when there is no mention in the cited testimony of pain that specifically affected his mobility); ¶ 16 (characterizing plaintiff as having "witnessed Ms. Graham arguing with Mr. Hassell and [having] tried to get Hassell to change his opinion" when plaintiff's testimony was that he was listening to Hassell's end of a telephone call with Graham, not on speakerphone, and that plaintiff could not hear what Graham was saying).) Plaintiff's counsel is reminded that Local Rule 56.1 statements are not the province of argument or spin. The Court has disregarded statements that are not supported by the evidence cited.

## MATERIAL FACTS

Most of the material facts are undisputed. Presence, which operates an acute-care medical center on the northwest side of Chicago, hired McNeal as Mental Health Counselor in January 2009. He was hired and supervised by Margaret Graham, a Nurse Manager in the Behavioral Health unit, who reported directly to Daniel Rakoski, Operations Director. McNeal regularly worked the night shift, while Graham worked the day shift. Prior to 2017, Graham and McNeal typically encountered each other a couple of times per week, and their day-to-day interactions were relatively limited.

Mental Health Counselors assist in providing care and treatment to inpatient adult psychiatric patients with various mental-health conditions, including major depression, psychosis, mood and personality disorders, and dementia. These patients often experience symptoms like suicidal tendencies, hallucinations, delusions, and hearing voices. They are vulnerable and often need significant care and treatment from mental-health providers, who must be calm, compassionate, professional, and patient in their interactions with patients. Mental Health Counselors at Presence are responsible for performing patient rounds to assess patients' status and the overall safety of the unit, monitoring patients with special precautions (e.g., risk of suicide or falling), and anticipating risk to the medical center or an individual and taking action to prevent, correct, or minimize the risk.

Mental Health Counselors play a vital role in creating a plan of care for patients in the Behavioral Health Unit. They are expected to regularly update a patient's medical record with information about the patient's treatment and progress, and the record is used to determine whether the patient is improving. Mental Health Counselors receive training on how to prepare appropriate notes in a patient's medical record; the training encompasses how to note objective assessments of a patient's current condition and their response to, and cooperation with, treatment.

Due to the volatility of the patient population and the danger patients may pose to themselves and others, Mental Health Counselors must be agile, flexible, and able to physically restrain patients and respond quickly to their behavior. They must be able to lift objects weighing 35-50 pounds, stand for two or more hours at a time, stoop, bend, and reach. As a precondition of employment, Mental Health Counselors must undergo a health screening to determine whether they are capable of safely performing the essential functions of their position with or without a reasonable accommodation. At the outset of his employment in 2009, McNeal reported that he had no back or neck problems and no problems with his arms or legs, and that he was cleared to work and deemed

physically able to safely perform the essential functions of the job.

McNeal and other Mental Health Counselors often worked with patients who were volatile, unpredictable, and aggressive, both verbally and physically, and who often had to be physically restrained. During his employment with Presence, McNeal was physically attacked by patients approximately twelve times, and he saw patients attack each other on a weekly basis. On one occasion, a patient kicked over a chair and started swinging at McNeal, who injured his shoulder while trying to defend himself and was then out of work for several days while recovering. On another occasion, McNeal was attacked by a patient who kicked over a Dynamap (a machine used to take vital signs) and struck McNeal before he was able to physically restrain the patient.

In March 2017, McNeal began to have problems walking; he felt like he was "walking on a ball" on one leg. He initially did not seek treatment for the condition, but ultimately decided to seek medical help. That month, McNeal was diagnosed with bilateral osteoarthritis and spinal stenosis, which caused him to experience pain when walking, standing, or otherwise using his legs. McNeal's condition is degenerative, and as it progressed, it became more painful for McNeal to perform his daily routine and essential job functions. He was slower, less agile, and less flexible, and it was more difficult for him to rise and stand from a sitting position. While his condition generally made it harder to do his job, he did not have any difficulty walking or standing for long periods of time. On April 27, 2017, a team leader in the Behavioral Health unit sent Graham, McNeal's supervisor, an email stating that the night-shift staff was complaining that McNeal was having a very hard time walking; he needed a Dynamap or an umbrella to get around; and he was only doing one to two rounds an hour when he should have been doing four. Graham never saw the email and therefore did not take any action to follow up on it.

On June 13, 2017, McNeal began a medical leave of absence in order to seek treatment for

his osteoarthritis. He requested his medical leave through AbsenceOne, Presence's third-party leave coordinator. He did not discuss his condition or need for leave with Graham. Although Graham had observed McNeal walking with difficulty and with his pants leg rolled up, and had heard him say that it was painful to have the material touch his leg, she was not aware of his particular condition or the underlying reason for his need for leave. Through AbsenceOne, McNeal requested and received multiple extensions of medical leave. He returned to work, without restrictions, on October 23, 2017. At his deposition, McNeal testified that following his return to work, he felt that he was able to stand without assistance during his entire shift as needed and was able to do his job "without issue." (ECF No. 32-3, Dep. of Thomas McNeal 276.) He never requested an accommodation for his medical condition or reported any issues performing the essential functions of his position due to his medical condition.

On November 1, 2017, the team leader who had emailed Graham in April about McNeal reported to Graham that she and several other staff members had safety concerns because McNeal was using a Dynamap to help him walk around during the night shift. Graham then reviewed surveillance video from the shift and saw that McNeal had been leaning on the Dynamap and appeared to be using it as an assistive device for the majority of his shift. Graham was concerned that this use of the Dynamap presented a risk of harm to McNeal and others in that patients might be able to throw McNeal off balance by taking the machine and using it against him or others. Graham consulted her supervisor, Rakoski, to discuss the matter. Rakoski watched the surveillance video, agreed with Graham's assessment, and suggested that McNeal be evaluated by someone in Presence's Associate Health department for whether he was able to perform the essential functions of his position, with or without a reasonable accommodation.

Thereafter, Graham directed McNeal to report to Brian Hassell, an Associate Health Nurse,

for an evaluation. Hassell asked Graham to describe her concerns in writing so that he could better understand the issues. On November 2, 2017, Graham emailed Hassell as follows:

> I had asked Thomas McNeal to be seen in [the Associate Health department] due to our concern regarding his safety and the safety of those with whom he works.
>
> I was informed by an associate that Thomas has difficulty ambulating and uses the dynamap as a cane. I conferred with our director of [the Behavioral Health department] and it was recommended that Thomas be evaluated for his ability to fulfil[l] his job duties in a safe manner. Our unit can be very volatile. It is a realistic concern that a patient grab the dynamap, throw Thomas off balance and use the machine against Thomas and/or others. In addition, staff must intervene regularly with patients having physical altercations.
>
> I viewed the video from last night and Thomas was using the dynamap for assist [sic] for the majority of the shift. Thomas is very skilled with intervening and de-escalating patients. We just want to be sure that he is physically able to handle an aggressive situation and maintain the safety of himself, as well as for others.

(ECF No. 32-5, Dep. of Margaret Graham, Ex. 3.)

Hassell forwarded Graham's email to Danielle Normand, Senior Associate Labor Relations Consultant. Hassell further stated to Normand that he had had McNeal "walk up the hallway" and although McNeal had a "side to side gait," he demonstrated that he could walk unassisted, and he was not using an assistive device when he came to Hassell's office. Hassell indicated that he would be sending McNeal "back to his doctors" for clearance to work. (ECF No. 32-2, Decl. of Danielle Normand, Ex. 5.) Hassell also told Normand that he "speculat[ed]" that it was "possible" that McNeal was "ok" with respect to a short walk down the hall, but it "could be" that as a work shift would continue, McNeal would be less able to walk without assistance. (*Id.*, Ex. 6.) After reviewing the information, Normand agreed that due to safety concerns, McNeal needed clearance from his physicians.

On November 2, 2017, Hassell sent letters to McNeal's physicians, Dr. Bathla and Dr. Strugala, attaching a copy of McNeal's job description and stating in pertinent part as follows:

> Due to [McNeal's] manager's concerns for both his and for patient safety, we have asked that he see you for an evaluation of his fitness for duty. One concern is that he has been observed using a rolling thermometer stand for assist [sic] for the majority of the shift. As well, as his unit can be very volatile, the concern is that a patient could grab the stand, throw Thomas off balance, and use the machine against Thomas and/or others. In addition, staff must intervene regularly with combative patients, often resulting in physical altercations. We want to be sure that he is physically able to handle an aggressive situation and maintain the safety of himself, as well as for others. A job description, Assessment for Return to Work form, and medical release of information form signed by the employee are included. Please review the job description in regards to his physical ability, and his ability to keep himself and others safe.

(*Id.*, Ex. 19.) Pending Hassell's request to McNeal's physicians, McNeal continued to work and was not removed from Presence's work schedule. On November 8, 2017, Hassell notified Normand, Rakoski, and Graham that both doctors had cleared McNeal to work without restrictions. McNeal continued to work as a Mental Health Counselor thereafter. For the remainder of McNeal's employment with Presence, there was no further discussion by Normand, Rakoski, or Graham about his medical condition.

At all relevant times, Presence has maintained a Corrective Action Policy (the "Policy"), which provides guidelines for addressing employees' performance and behavioral issues, including guidelines for recommended levels of discipline based on four categories of infractions. The categories are I (Documented Verbal Warning), II (Written Warning), III (Final Written Warning), and IV (Termination), depending on the seriousness of an infraction. (*Id.*, Ex. 3.) For Category IV infractions, employees are subject to immediate discharge even for first-time offenses. The Policy provides that the Human Resources department should always be consulted prior to the issuance of a Final Written Warning or termination. The Policy also states that, "[w]hile often appropriate, progressive disciplinary action is not guaranteed" and that "[s]teps may be skipped depending on the severity of the infraction, or on facts and circumstances of the situation."

On January 18, 2018, a social worker in the Behavioral Health unit told Milagros Delacruz-Machado ("Machado"), a Nurse Manager who was covering for Graham while Graham was on medical leave,[1] that McNeal had made an unprofessional note in a patient's chart. McNeal's note read as follows:

> To call someone a moron is "untherapeutic" not to mention - not very nice. And yet, this moron is incessant in his verbosity and unceasing in his pacing. These behaviors persist despite medication and despite redirection. Thus, what else is t[h]ere in the realm of remediation. With inexorable pride no less he continues to be profane, confrontational, delusional and oppositional. With all this he is inexplicably poised for discharge - go figure!

(*Id.*, Ex. 8.) Machado, who has been a nurse since 1992, had never seen a note like that in a patient's chart and agreed that it was unprofessional. Once entries are made in a patient's chart, they cannot be changed; an addendum can be made to address erroneous entries, but the original entry always remains and can never be deleted.

Machado notified Patricia Endara, Operations Manager, who was covering for Rakoski while he was out of the office, who notified Normand, describing the note as "unprofessional and of concern." (*Id.*, Ex. 9.) Normand agreed with Endara's assessment and expressed her belief that the note could lead to McNeal's termination under Presence's Corrective Action Policy. (Normand Decl. ¶ 26, Ex. 9.) Normand asked Endara to interview McNeal to get his explanation about the note. Normand also conferred with employees in the Risk Management and Compliance departments to get their views on the note. Ashley Durham, the Regional Director of Risk Management, believed that the note was unprofessional, included information that should not be included on a patient chart, and inappropriately questioned the physician's decision to discharge the

---

[1]Graham was diagnosed with cancer in 2017 and took multiple intermittent medical leaves of absence during 2017 and 2018.

patient. Normand also believed that McNeal's decision to document his apparent disagreement with the physician's decision was inappropriate; if McNeal disagreed with a decision about the patient's plan of care, he should have discussed the matter with the physician or the charge nurse or during an interdisciplinary team meeting.

Endara, along with Machado, met with McNeal. Prior to the meeting, Endara had never met McNeal and had no knowledge of his medical condition. During the meeting, Endara did not notice anything unusual about McNeal's gait. McNeal admitted that he had written the note. Endara sent an email to Normand and others stating in part that McNeal expressed remorse about the note and said that he had been frustrated with the patient. (*Id.*, Ex. 10.) Endara also stated that she felt uncomfortable at that time making a discipline recommendation because she did not know McNeal, and Rakoski and Graham were on leave. At her deposition, Endara further explained that she did not want to make a decision "in a vacuum" and that she had no knowledge about McNeal's disciplinary history.

On January 22, 2018, Normand recommended that McNeal's employment be terminated because she believed that the note was cruel, unprofessional, inappropriately reflected disdain for the patient, and called into question whether McNeal had the patience and compassion necessary to continue to effectively perform his job duties. In an email to Endara, Graham, Rakoski, and others, Normand stated that the matter "should result in termination due to the inappropriate language directed at the patient, and [McNeal's] unprofessionalism documented in the record. I would also like to hear from his managers on their thoughts about this case, however the HR recommendation could be a possible Final [Written Warning] at minimum but should be a termination." (*Id.*) Endara agreed with Normand that the appropriate discipline was termination, but they elected to wait for Graham to return to work in order to obtain her input before making a

final decision.

Graham returned from medical leave on January 24, 2018. The next day, Endara and Normand consulted with her about McNeal's note and their ensuing recommendation that his employment be terminated. Graham agreed that the note warranted termination. She was shocked by it, concerned that anyone who saw the chart could see it, and thought that it reflected poorly on Presence.

The same day, January 25, 2018, Normand received notice of an anonymous complaint about McNeal that was made through the Presence Compliance Hotline, in which the caller alleged that McNeal had stolen employees' food from the break room; had a crack pipe in his shoe; and had said, within earshot of the social worker who had complained about the note in the patient's chart, that he had a gun. Normand asked Graham to talk to McNeal about the claims; he denied them. There was insufficient information to substantiate the caller's allegations, so they were not considered to be a basis for discipline against McNeal.

Nonetheless, Normand, Endara, and Graham agreed to terminate McNeal's employment based on the inappropriate chart note. Graham and Normand drafted McNeal's termination notice. The notice stated that McNeal had violated two provisions of Presence's Corrective Action Policy: (1) "Engaging in any conduct which is damaging to Presence Health or reflects adversely on patients or visitors" (a Category II infraction); and (2) "Use of abusive, vulgar, obscene, or profane language toward others, disparaging or derogatory comments or racial/ethnic slurs, intimidation, bullying or name calling, or other such behaviors" (a Category IV infraction). (*Id.*, Ex. 13.) McNeal's employment was terminated on January 29, 2018. Normand and Graham deny that McNeal's medical condition was a factor in the termination decision. They also state that they have never encountered such a derogatory note about a patient in a medical chart.

McNeal filed this action on July 25, 2018. He alleges that Presence, in violation of the ADA, used his "minor infraction" as pretext to conceal that his employment was terminated due to his disability "and/or his Manager's baseless perception that he is disabled and unable to perform his duties." (ECF No. 1, Compl. ¶ 16.) He seeks damages and "appropriate equitable relief such as reinstatement." (*Id*. at 5, Prayer for Relief.) Presence moves for summary judgment.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016). The Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmovant. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). Under Rule 56, the movant has the initial burden of informing the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmovant's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant need not produce evidence in a form that would be admissible at trial, but he must go beyond the pleadings to demonstrate that there is evidence upon which a jury could reasonably find in his favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

The ADA, as amended, provides that no covered entity shall discriminate against a qualified

11

individual on the basis of disability with regard to the discharge of employees. 42 U.S.C. § 12112(a). To prove a violation of § 12112(a), a plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the termination was caused by his disability. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503-04 (7th Cir. 2017).

Presence contends that it is entitled to summary judgment because McNeal is unable to a create a genuine issue of fact as to whether he was disabled within the meaning of the ADA. The Court agrees. Not all impairments are disabilities for purposes of the statute. *Krocka v. City of Chi.*, 203 F.3d 507, 512 (7th Cir. 2000). An individual has a "disability" within the meaning of the ADA if he has a physical or mental impairment that "substantially limits one or more major life activities"; has a record of such an impairment; or is regarded as having such an impairment. *Bodenstab v. Cty. of Cook*, 569 F.3d 651, 656 (7th Cir. 2009) (quoting 42 U.S.C. § 12102(2)). McNeal must present evidence that he was disabled under one or more of these definitions. *See Squibb v. Mem'l Med. Ctr.,* 497 F.3d 775, 780 (7th Cir. 2007). He claims that he was substantially limited in the major life activity of walking. "For an individual to be considered disabled with regard to the major life activity of walking, . . . the limitation on an individual's ability to walk must be permanent or cover a long period of time and must be considerable compared to the walking most people do in their daily lives." *Valadez v. Steiner Corp.*, 156 F. App'x 821, 823 (7th Cir. 2005); *see also Turner v. The Saloon, Ltd.*, 595 F.3d 679, 689 (7th Cir. 2010) (merely "walking with difficulty" is not a significant restriction on walking, nor where ability to walk is merely for shorter distances or at a slower pace). While McNeal points to his diagnoses of spinal stenosis, osteoarthritis, and hip

deterioration,[2] and says that these conditions "led to him taking medical leave in 2017," (ECF No. 48, Pl.'s Resp. Def.'s Mot. at 6), he fails to develop any argument or cite to the record regarding difficulties he experienced or that they were sufficiently severe to rise to the level of a substantial limitation. He also fails to point to facts showing that his walking impairment was long-term or affected his work performance after his return to work. In fact, the evidence is to the contrary; McNeal testified at his deposition that during his employment with Presence, although his conditions made him "slower" and less flexible and caused him to experience pain, he did not have difficulty walking or standing for long periods of time. (McNeal Dep. 80-82.) When he returned to work, he had no restrictions. He also testified that he did not begin to feel that he needed an assistive device to walk until after his employment was terminated. (*Id.* 79.)

McNeal also argues that Presence regarded him as having had a physical impairment that substantially limited the major life activity of working, but he fails to present evidence sufficient for a reasonable jury to so find. To establish a "regarded as" claim, it is not enough for a plaintiff to show that the employer knew of the plaintiff's impairment; he must also show that the employer believed that one or more of the plaintiff's major life activities were substantially limited by the impairment. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001). When working is the major life activity at issue, it is not enough for a plaintiff to establish merely that his employer believed his impairment significantly restricted his ability to perform his specific job; instead he must show that his employer believed his condition significantly restricted his ability to perform a broad range of jobs. *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 523 (7th Cir. 2009).

McNeal asserts that Graham perceived him as disabled, citing her actions in November 2017

---

[2]As to hip deterioration, McNeal relies on a radiology report from December 2018.

after having received information that McNeal was using a Dynamap to help him walk. McNeal also cites his own testimony about (1) having witnessed Hassell's end of a telephone conversation with Graham, who, McNeal concluded, appeared to have taken issue with Hassell's assessment that McNeal was able to walk such that he could perform the essential duties of his job; and (2) McNeal's conversation with Graham immediately thereafter, in which he told Graham that he "could handle the job," and she replied that she was unsure about that and that while he could continue to work, he needed to obtain new return-to-work authorizations from his doctors.[3] (McNeal Dep. 12-14; 288-291.) It is undisputed, however, that Graham acted after receiving a report from an employee about safety concerns that McNeal was using a Dynamap to help him walk, and there is no evidence that the concerns were illegitimate. It is also undisputed that Graham was not acting alone; she consulted her supervisor, Rakoski, who suggested that McNeal see Hassell, and that thereafter, Normand agreed that McNeal needed his physicians' clearance. The steps taken to reassure an employer that an employee is fit for duty where there is a legitimate concern about an employee's ability to perform a particular job, however, are not proof that the employer regarded the employee as "disabled" within the meaning of the ADA. *Krocka*, 203 F.3d at 515; *Thames v. St. Vincent Stress Ctr.*, No. 1:09–CV–1041–SEB–TAB, 2010 WL 5124733, at *7 (S.D. Ind. Dec. 9, 2010) ("[Defendant's] requirement that [plaintiff] complete a fitness for duty examination merely establishes that Defendant harbored some doubt as to her ability to perform particular essential functions of her job, but such doubt alone does not establish or demonstrate that [defendant] regarded [plaintiff] as disabled."). Although the results of an evaluation requested by an employer

---

[3] Graham denies having expressed disagreement with Hassell's assessment or having had a conversation with McNeal about it immediately thereafter, but for purposes of summary judgment, the Court accepts McNeal's version of the events as true.

can in some instances indicate the employer's perception of the employee's ability to function on the job and thus provide some evidence that the employer regarded the employee as disabled, *Krocka*, 203 F.3d at 515, here McNeal was permitted to remain working while obtaining his doctors' evaluations. And, after those evaluations were submitted and the doctors indicated that McNeal could perform his job duties without restriction, he was allowed to continue to work, and there was no further action by Presence on the matter. Accordingly, McNeal has failed to demonstrate a genuine issue of material fact that Presence regarded him as substantially limited in the major life activity of working.

Even if McNeal were able to create a genuine issue as to whether he is disabled within the meaning of the ADA, he has failed to point to evidence that his alleged disability was the but-for cause of the termination of his employment. The ultimate question in a case for discriminatory employment termination is whether a reasonable juror could conclude that the plaintiff would have kept his job if he were not disabled and everything else had remained the same. *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019). One way to so demonstrate is to show that the stated reasons for the firing were pretextual. *Id.* "In evaluating pretext, 'the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge.'" *Id.* (quoting *Monroe*, 871 F.3d at 505). "Pretext requires more than just 'faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.'" *Id.* (quoting *Monroe*, 871 F.3d at 505) (brackets omitted).

Presence has set forth evidence that it fired McNeal because he made a derogatory note about a patient in the patient's medical chart that included the statement that the patient is a "moron," and in which McNeal implied disagreement with a physician's medical decision. Presence has also

15

submitted evidence that this conduct fell within "Category IV" of its disciplinary plan, which warranted immediate termination. In response to Presence's motion, McNeal states that he "never denied doing this" and "immediately expressed remorse," and he downplays his conduct by noting that there is no evidence that the patient was aware of the note. (Pl.'s Resp. Def.'s Mot. at 3.) He also suggests that termination was too harsh a response. But an employer's explanation is a pretext for discrimination only if it is a lie. *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 828 (7th Cir. 2008). There is no evidence that calls into question the legitimacy of Presence's basis for the termination.

McNeal attempts to demonstrate pretext through what he calls a "combination of overt hostility and disparate treatment." (Pl.'s Resp. Def.'s Mot. at 1.) First, he points to six fellow employees under Graham's supervision who he says were similarly situated to him, not disabled, and engaged in serious misconduct but were not terminated. To succeed on a discrimination claim based on alleged disparate treatment in discipline, McNeal has to show that other mental health counselors at Presence "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or [Presence's] treatment of them." *Shott v. Rush Univ. Med. Ctr.*, 652 F. App'x 455, 459 (7th Cir. 2016). The proposed comparators must be comparable "in all material respects," which includes "a showing that the employee held the same type of job, was disciplined by the same supervisor, was subject to the same standards, had comparable experience and qualifications, and engaged in the same conduct without differentiating or mitigating circumstances." *Bodenstab*, 569 F.3d at 657 n.2; *see also Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 688 (7th Cir. 2007) ("In disciplinary cases—in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that he is similarly

16

situated with respect to performance, qualifications, and conduct.") (brackets omitted). McNeal fails to make this showing. None of the six employees McNeal identifies engaged in a similar incident involving a notation on a patient's chart. In conclusory fashion, McNeal characterizes their misconduct as "at least as serious as" McNeal's infraction, (Pl.'s Resp. Def.'s Mot. at 9), and identifies some of their infractions as violations of the same rule that McNeal was found to violate, but he fails to present any meaningful discussion of where their misconduct would fall within the categories of Presence's Corrective Action Policy. Some of the misconduct to which McNeal points involved allegations that were ultimately unsubstantiated. Three of the six employees McNeal identifies are not proper comparators because they are nurses, not mental health counselors. Furthermore, McNeal fails to discuss any of the proposed comparators' backgrounds—their experience, tenure, or disciplinary history.[4] While a proposed comparator need not be identical to the plaintiff in every conceivable way, *Brown v. Health Care Service Corp.*, 606 F. App'x 831, 834 (7th Cir. 2015), McNeal has not provided sufficient evidence to allow a useful comparison between him and the proposed comparators.

McNeal also maintains that he can show pretext in that Graham, whom he deems the "primary decision maker for his termination," had "expressed hostility" to his impaired ability to walk. (Pl.'s Resp. Def.'s Mot. at 1.) (McNeal does not suggest that the other decisionmakers,

---

[4]Presence submits unrebutted evidence that during McNeal's employment, he was disciplined on thirteen occasions, nine for attendance-related issues and four for conduct or behavioral issues, including two Final Written Warnings. McNeal fails to directly admit or deny these facts, and simply denies their materiality on the basis that Endara testified that as far as she knew, McNeal's employment history was not a factor in the decision to terminate his employment. (Pl.'s Resp. Def.'s L.R. 56.1 Stmt. ¶¶ 41-45.). (Normand, however, states in her declaration that she did consider McNeal's disciplinary history in deciding to recommend termination.) (Normand Decl. ¶ 30.) But McNeal overlooks that his disciplinary history is also relevant to the issue of proper comparators.

17

Normand and Endara, harbored any discriminatory animus. Nor does he address the fact that the charting matter arose when Graham was on medical leave, and that Normand, not Graham, made the initial recommendation for termination.) This argument is unpersuasive. McNeal cites Graham's alleged disagreement with Hassell about whether McNeal could walk without assistance. McNeal also cites Graham's "demeanor," (*id.* at 13), after his doctors cleared him to work; while he testified at his deposition that Graham never made a disparaging comment to him on the basis of any disability, he says that she "distanc[ed] herself" from him and did not say hello in the hallway. (McNeal Dep. 19, 293.) This evidence, without more, is insufficient to support a reasonable inference that Graham harbored any discriminatory animus relating to his alleged disability, much less that Graham's alleged animus was connected to the decision to terminate McNeal's employment. *See Coldwate v. Alcatel-Lucent USA, Inc.*, No. 10 CV 4918, 2013 WL 1222341, at *3 (N.D. Ill. Mar. 25, 2013) (concluding that plaintiff's supervisor's expression of doubt about plaintiff's ability to do his job and request that plaintiff undergo medical examinations before returning to work demonstrated nothing more than the supervisor's legitimate concern that plaintiff would be unable to perform the essential functions of his job); *Russo v. Midland Paper Co.*, No. 09 CV 7739, 2011 WL 5025238, at *5 (N.D. Ill. Oct. 21, 2011) (in discriminatory-termination case, employee's feeling that her superiors were being "cold" to her was not enough to support an inference of discrimination); *Respondi v. Merrill Lynch & Co.*, No. 96 CV 2618, 1998 WL 355447, at *4 (N.D. Ill. June 25, 1998) (stating that "no reasonable trier of fact could infer discriminatory intent from [a supervisor's] alleged unfriendliness," without more, where supervisor allegedly stopped saying hello after learning of employee's pregnancy).

Taking all the evidence in the light most favorable to McNeal, the Court concludes that no jury could reasonably find that McNeal is disabled or that Presence's legitimate reason for

terminating his employment was a pretext for disability discrimination. Accordingly, the Court need not address Presence's arguments that McNeal cannot show that he was a qualified individual or that any damages would be limited by the after-acquired evidence doctrine. Summary judgment will be entered in favor of Presence.

## CONCLUSION

Presence Chicago Hospitals Network's motion for summary judgment [30] is granted. Judgment will be entered in favor of defendant, Presence Chicago Hospitals Network, and against plaintiff, Thomas McNeal. Civil case terminated.

**DATE**: August 28, 2019

_____

**Ronald A. Guzmán**
**United States District Judge**